## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| BARAA FADEL, HAKIMA AITELHADJ, KARON COLEMAN, MATTHEW GREENE, and JOSEPH MCGUNIGLE, on behalf of themselves and others similarly situated, | ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) | Civil Action No. 1:22-cv-11827-FDS |
| v. | ) ) |  |
| G4S SECURE SOLUTIONS (USA), INC., UNIVERSAL PROTECTION SERVICES, LLC, and ALLIED UNIVERSAL SECURITY SERVICES, LLC, | ) ) ) ) ) |  |
| Defendants. | ) ) |  |

_____ )

## PLAINTIFFS' ASSENTED-TO MOTION FOR
## FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND
## <u>MEMORANDUM IN SUPPORT THEREOF</u>

Plaintiffs, on behalf of themselves and the settlement class of over 100 employees preliminarily certified by this Court, seek final approval pursuant to Fed. R. Civ. P. 23(e) of a proposed class action settlement. This settlement is a fair, reasonable, and adequate result that was obtained after extensive litigation conducted by experienced counsel. It will afford workers a substantial monetary award in compensation for their damages, and the proposed incentive awards to the named plaintiffs as class representatives and the requested allocation for attorneys' fees, are fair and reasonable and supported by applicable precedent. Accordingly, Plaintiffs ask that this Court

grant final approval of this settlement and dismiss this case with prejudice.  A proposed order is attached as Exhibit A.

## BACKGROUND

Plaintiffs Baraa Fadel, Hakima Aitelhadj, KaRon Coleman, Matthew Greene, and Joseph McGunigle ("Named Plaintiffs"), filed this case against G4S Secure Solutions (USA), Inc. ("G4S") and Universal Protection Service, LLC d/b/a Allied Universal Security Services ("Allied Universal"),[1] alleging that Defendants did not pay their security officers who were assigned to work at the General Electric headquarters site for all wages and overtime wages owed to them under Massachusetts law.

Plaintiffs each worked as security officers at the General Electric Company's headquarters in Boston, Massachusetts.  ECF Doc. No. 1-3 (Compl. ¶ 1)  Defendant G4S was their employer until it was acquired in 2021; Defendant Allied Universal then became their employer.  *Id.* ¶¶ 9, 10, 3-8.  Each Plaintiff was subject to an alleged policy and practice requiring them to report at least approximately ten minutes before the start of their shifts and to work, off-the-clock, during this time.  Compl. ¶ 18.  Their pre-shift work included tasks such as debriefing officers they were relieving and checking the work site, all allegedly without pay.  *Id.* ¶ 19.  In addition, certain officers, including

---

[1]      As outlined in previous briefing, Defendants asserted that Allied Universal was incorrectly named  in the Complaint as two separate entities, a matter that did not affect the proposed settlement.

Plaintiff Fadel, allegedly participated in required, weekly telephone conferences of up to approximately one hour to update higher management, again without pay. *Id.* ¶ 20.

Plaintiffs sued on September 28, 2022. The Complaint asserts two counts under Massachusetts law. Count I, brought pursuant to Mass. Gen. L. c. 149, § 150, alleges Defendants failed to pay officers at the General Electric headquarters site for all hours worked, violating Mass. Gen. L. c. 149, § 148. Count II, brought pursuant to Mass. Gen. L. c. 151, § 1B, alleges Defendants' failure to pay time-and-a-half for overtime hours violated Mass. Gen. L. c. 151, § 1A. Compl. at 8-9. The Complaint sought lost wages, statutory trebling, interest, and attorneys' fees and costs. *Id.* at 9-10. On December 16, 2022, the Parties' counsel conferred and agreed to a stay of the proceedings to allow the Parties the opportunity to partake in formal mediation and settlement negotiations.

The parties engaged in a mediation, with Defendants producing pre-mediation discovery to assist the discussions. Pursuant to a Negotiation/Mediation Agreement, Defendants produced to Plaintiffs an anonymous class list identifying each member of the putative class with their start and end dates of employment and number of shifts worked during the class period, payroll data for putative class members, including information regarding their shifts, pay rates, and total hours paid, and data regarding putative class members that Defendants asserted were bound by arbitration agreements. These materials allowed Plaintiffs to evaluate the maximum recovery possible for the class. On April 13, 2023, the parties engaged in a full-day mediation with D. Charles Stohler, Esq., an experienced mediator in the field of employment law class actions. The parties were able to bridge their different positions and reached a

3

proposed classwide settlement.  Through those negotiations, and based on Class

Counsel's experience, Plaintiffs identified the following risks, among others, to

continued litigation:

- The risk that the Court would dismiss the case as to certain plaintiffs and
  class members and refer their claims to arbitration.

- The risk that the Court would not certify a class in this suit (or that the class
  would be subject to later decertification).

- The risk that either the Court, on summary judgment, or a jury would
  ultimately decide against Plaintiffs and the class.

- The risk that a jury would award less than the maximum recovery to
  Plaintiffs and the class after a trial.

- The risk that the case would last for several more years, delaying the potential
  recovery.

The result of those negotiations is that the parties have agreed to resolve their

claims on behalf of the putative class, for the total sum of $200,000 (subject to Court

approval).  The parties filed the settlement agreement with the preliminary approval

motion.  *See* Mot. for Prelim. Approval, ECF Doc. No. 37; Ex. A, ECF Doc. No. 37-1.

Taking into consideration the procedural posture of this case, counsel's knowledge of

the facts and law relevant to the issues, and the uncertainty and expense of further

litigation, Plaintiffs submit that this proposed settlement is a fair, reasonable, and

adequate result for the class.

The Court preliminarily certified a settlement class, preliminarily approved the

proposed class settlement, and authorized the parties to issue notice to the individuals

4

who met the class definition on June 29, 2023.  ECF Doc. No. 46.  The parties then
retained an independent claims administrator, which issued the notice to the class
members and which has managed the process (*e.g.,* following up on undeliverable
notices, responding to class member inquiries, and correcting address and other
information, *inter alia*).

I.    **Results of the Notice Process.**

Defendants identified all members of the settlement class pursuant to the
proposed plan of notice and produced names and mailing addresses for the 108
individual guards who worked at General Electric Headquarters during the relevant
period.  Affidavit of Osvaldo Vazquez ("Vazquez Aff."), attached as Exhibit B, ¶ 2.

Following this Court's preliminary approval of the settlement on June 29, 2023,
Plaintiffs' counsel engaged an experienced third-party claims administrator, Optime
Administration, LLC ("Optime"), to manage the notice and claims process.  *Id.*, ¶ 3;
Affidavit of Anthony Gomez ("Gomez Aff."), attached as Exhibit C, ¶¶ 1-4.  Optime
sent notices to 107 of the identified class members via first-class mail, in the form
attached as Exhibit D.  *Id.*, ¶ 5. Optime also sent the notice packet by email to all 108
individuals, 103 of whom also received the notice packet by first-class mail.  *Id.*  In total,
Optime sent the notice packet to all 108 individuals by first-class mail and/or by email.
*Id.*  The Notice described the claims in the case, the history of the litigation, the
proposed settlement terms, and the plan of distribution.  The Notice also informed class

members of the final approval hearing and of their opportunity to voice any objections

to the terms of the settlement or to request exclusion from the settlement.

As of the September 16, 2023 deadline, no members of the class objected to the

settlement and no members requested exclusion. *Id.*, ¶ 8. Of the original notices sent by

first-class mail, 16 were returned as undelivered. *Id.*, ¶ 7. Optime used public

information to successfully identify updated addresses for 12 of those 16 class members.

*Id.* It was unable to find updated addresses for 4 of the class members, but all 4 of those

successfully received the notice packet by email. *Id.* As a result, notice successfully

reached 100 percent of the class members.

## II. The proposed plan for distribution of the settlement fund.

The parties have agreed to settle this case for $200,000. From that amount, the

settlement agreement provides that (subject to Court approval): one-third be used to

pay Plaintiffs' counsel for their attorneys' fees (totaling $66,000); $12,500 be paid as an

incentive payment to Named Plaintiff Fadel and $3,000 each as incentive payments to

Named Plaintiffs Aitelhadj, Coleman, Greene, and McGunigle as compensation for their

significant time and effort in prosecuting this case on behalf of their fellow officers and

for a broader general release of all known and unknown claims; a reasonable amount

not to exceed $5,000 for litigation expenses (exclusively for the costs of settlement

administration). The remaining amount will be distributed to the settlement class

members. The settlement agreement also provides that the amount of each such

payment be calculated proportional to the amounts of wages that allegedly were not

paid to class members from May 16, 2019 to June 29, 2023. Specifically, the formula for

6

calculating class members' settlement shares takes into account their hourly pay rate and average shifts per week to calculate each class members' unpaid wages owed (assuming ten unpaid minutes per shift per class member) and distributing the class members' settlement shares proportional to their potential damages. In this manner, each settlement class member would receive a settlement payment that is commensurate with the damages they allegedly sustained. The agreement further provides that a small reserve fund (of $1,000) be set aside to resolve disputes and other administrative issues. Any amounts from uncashed checks and from any reserve fund would be held for 180 days from the date checks are mailed and used to resolve disputes, if necessary. After the 180 days have elapsed, the agreement provides that all remaining residual funds be distributed on a *cy pres* basis to the Employment Unit of Greater Boston Legal Services.

Plaintiffs' counsel was responsible for calculating claimant's shares (subject to review and approval by counsel).

The monies are being distributed to settlement class members pursuant to a formula that takes into consideration individuals' shifts worked, pay rates, and likely overtime hours. Affidavit of Hillary Schwab ("Schwab Aff."), attached as Exhibit E, ¶ 3. Specifically, Plaintiffs' counsel calculated potential damages based on information provided by defense counsel about class members' pay rates, total shifts worked during the applicable time period, and total workweeks during the applicable time period. *Id.*, ¶ 4. To determine likely overtime, Plaintiffs' counsel divided total shifts by total workweeks to determine average shifts per week. Plaintiffs' counsel assumed a

percentage of overtime damages per week based on average shifts per week, namely

30% overtime shifts for between 0 and 1.5 shifts per week, 60% overtime shifts for

between 1.5 and 4 shifts per week, and 90% overtime shifts for over 4 shifts per week.[2]

*Id.*, ¶ 5.

      Plaintiffs' counsel calculated unpaid hours for each class member by dividing the

total number of shifts by six, *i.e.*, assuming ten minutes of unpaid work per shift.

Plaintiffs' counsel multiplied total unpaid hours by the hourly rate (with a percentage

of hours calculated at the overtime (1.5x) rate, as described above.  *Id.*, ¶ 7.  The formula

was as follows:

| Class members with 0 to 1.5 shifts per week | (unpaid hours x straight-time pay rate x 0.7) + (unpaid hours x overtime pay rate x 0.3) |
|---|---|
| Class members with 1.5 to 4 shifts per week | (unpaid hours x straight-time pay rate x 0.4) + (unpaid hours x overtime pay rate x 0.6) |
| Class members with over 4 shifts per week | (unpaid hours x straight-time pay rate x 0.1) + (unpaid hours x overtime pay rate x 0.9) |

*Id.*, ¶ 8.

      The settlement shares ($103,500, after subtraction of attorneys' fees, costs,

enhancement awards for the Named Plaintiffs, and the reserve fund) were then

---

[2]     While this formula likely overcounts overtime hours, it does so in a manner that is consistent and similarly beneficial for all class members.  Schwab Aff. ¶ 6.

allocated among class members proportional to their damages under the above formula.  *Id.*, ¶ 9.

Pursuant to the parties' settlement agreement, payments from the settlement fund would begin no later than 30 days after the Court grants final approval of the settlement and the Defendants' funding of the settlement.  The settlement administrator will be responsible for issuing the payments and reporting the income on IRS Forms 1099 as "other income."

With Defendants' assent, Plaintiffs now respectfully request that the Court grant final approval of the parties' proposed class settlement.  As discussed below, the settlement is a fair, reasonable, and adequate result given the risks and expense associated with further litigation.  It was accomplished through extensive arms' length bargaining between represented parties whose counsel have substantial experience litigating in this area of the law.  Furthermore, the terms of the proposed settlement are in keeping with relevant precedent and will afford substantial monetary recovery to the proposed settlement class members.

## ARGUMENT

### I.    The notice process was fair, reasonable, and adequate.

As set forth above, the parties conducted a thorough and diligent notice process, and made all reasonable efforts to reach as many class members of process.  That process, which included at least two forms of notice where possible, is fair, reasonable, and adequate.

The Notice, *see* Exhibit D, unquestionably constitutes sufficient notice for purposes of settlement approval.  It describes in plain terms the allegations in this case, the terms and the amount of the settlement, the provision for attorneys' fees, and the proposed incentive payments to the Named Plaintiffs.  It also identifies the date, time, and location of the final approval hearing, and affords class members the means and opportunity to request exclusion or file an objection.  2 McLaughlin on Class Action § 6:17 (10th ed.) ("settlement notice . . . must contain enough information about the settlement and its implications for participants to enable class members to make an informed decision about whether to be heard concerning the settlement") (collecting cases).

Furthermore, sending notice by first-class mail to the last known address of each class member is the best practicable and most widely accepted means of disseminating information about the settlement.  *Id.*  ("[C]ourts have consistently held that first-class mail addressed to class members' last known address . . . [is] sufficient to satisfy the notice requirements") (collecting cases); *see also* Prelim. Approval. Mot. at 7 (citing additional cases).  Courts have also endorsed use of email and/or use of multiple forms of contact to provide notice of proposed class settlements.  *See* Prelim. Approval. Mot. at 7.  As one court noted, "'[n]otice need not be perfect, but need be only the best notice practicable under the circumstances, and each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members.'"  *Serio v. Wachovia Secs., LLC*, 2009 WL 900167, at *8

(D.N.J. Mar. 31, 2009) (*quoting In re Merrill Lynch TYCO Research Sec. Litig.*, 249 F.R.D. 124, 133 (S.D.N.Y. 2008)).

There can be no question that class counsel has acted reasonably in choosing direct mailing to current/recent addresses as the means of notice most likely to inform settlement class members about this settlement. Here, the mailing of the notice to identified class members by first-class mail, following up on undeliverable notices, and emailing where available unquestionably meets the notice requirements. *See, e.g., In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1261 (10th Cir. 2004) (notice held reasonable and adequate even though 1,455 out of 6,423 claim forms were "not actually received"). Because the notice process here also included email, thus reaching additional individuals, notice was more than sufficient. Moreover, successful notice to 100% of class members class members far exceeds thresholds deemed reasonable and adequate in past decisions. *See id.*; *see also, e.g., Ebner v. Merchants & Med. Credit Corp.*, No. CV 14-06882, 2017 WL 1079966, at *4 (E.D. Pa. Mar. 22, 2017) (notice satisfied Rule 23 where there was "a 91.8 percent penetration rate"); *Bowman v. Art Van Furniture, Inc.*, No. 17-11630, 2018 WL 6445389, at *3 (E.D. Mich. Dec. 10, 2018) (same, where "[t]he Notice reached over 90% of the class").[3]

---

[3]     *See also Brown v. Colegio de Abogados de Puerto Rico*, 2011 WL 721910, at *2 (D.P.R. Feb. 28, 2011) ("[T]he fact that around 9.5% of the Class Action Notices have been returned as undeliverable is not unexpected and does not warrant extending the opt-out deadline. In fact, larger percentages of undeliverable notices have resulted in notice procedures being approved.").

II.    **The proposed settlement is fair, reasonable, and adequate.**

Settlement is favored over protracted litigation.  Newberg on Class Actions,
§ 11:41 ("The compromise of complex litigation is encouraged by the courts and favored
by public policy"); *see also* Prelim. Approval Mot. at 13 (citing additional authority).
The advantages of settlement to the parties and the courts are particularly apparent in
the compromise of class actions, which are "often complex, drawn-out proceedings
demanding a large share of finite judicial resources."  *Mayfield v. Barr*, 985 F.2d 1090,
1092 (D.C. Cir. 1993); *see also Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("In the
class action context in particular, 'there is an overriding public interest in favor of
settlement,' [which] minimizes the litigation expenses of both parties and also reduces
the strain such litigation imposes upon already scarce judicial resources.").

Before approving a class action settlement, the Court must find that the
settlement is fair, reasonable, and adequate.  *See* Fed. R. Civ. P. 23(e); *see also In re Relafen
Antitrust Litig.*, 360 F. Supp. 2d 166, 195 (D. Mass. 2005).  When evaluating a class action
settlement for purposes of approval, a "court's discretion is restrained by 'the clear
policy in favor of encouraging settlements.'"  *Durett v. Housing Auth. of Providence*, 896
F.2d 600, 604 (1st Cir. 1990) (citations omitted).

A presumption of fairness is established where the parties can show that: (1) the
settlement was the product of arms' length bargaining; (2) sufficient discovery and
investigation has been taken to enable counsel and the court to act intelligently; (3) the
proponents of the settlement are counsel experienced in similar litigation; and (4) the
number of objectors or interests they represent is not large when compared to the class

as a whole. *In re M3 Power Razor System Marketing & Sales Practice Litigation*, 270 F.R.D.

45, 62-63 (D. Mass. 2010); *see also* Newberg on Class Actions § 11:41.

All four of these factors weigh decisively in favor of approval. First, the

settlement was the product of arms' length bargaining. Indeed, the parties in this case

reached this settlement after months of litigation and a day-long mediation facilitated

by an independent and experienced mediator. Second, Defendants produced ample

discovery prior to the mediation, showing class members' shifts, hours worked, and

pay. Class Counsel also had the benefit of extensive conversations with the five Named

Plaintiffs, experienced, long-term employees, who had extensive insight into, and

evidence of, Defendants' past practices. Both sides submitted to the mediator and

shared with one another pre-mediation statements with detailed factual support for

their respective positions. The parties, therefore, were well aware of the merits of their

positions, and the risks of continued litigation before negotiating. *See Beckman v.*

*KeyBank, N.A.*, 293 F.R.D. 467, 475 (S.D.N.Y. 2013) ("The pertinent question is 'whether

counsel had an adequate appreciation of the merits of the case before negotiating.'"

(quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004)).

Third, counsel for all parties are experienced in this type of litigation. Hillary

Schwab and Osvaldo Vazquez of Fair Work, P.C. and Alan D. Meyerson of the Law

Office of Alan David Meyerson together have extensive experience litigating and

settling class actions, including claims brought under the Massachusetts wage laws.

Similarly, Defendants' counsel Robin E. Largent, Kelly Eisenlohr-Moul, and Devin S.

Cohen of Martenson, Hasbrouck & Simon LLP and Mark S. Bodner of Melick & Porter,

LLP have litigated numerous class and collective action cases involving wage laws throughout the country. Thus, both sides in this case are well versed in this area of law and are familiar with the issues and risks involved in wage and hour-related class action litigation.

Fourth, there were no objections to the proposed settlement.

Moreover, the amounts being recovered by settlement class members further demonstrates the fairness of the settlement. The total amount to be distributed to the settlement class is $103,500, after subtraction of the proposed amounts for attorneys' fees, costs, enhancement awards for the Named Plaintiffs, and the reserve fund. This amount is fair because it approximates single damages for the class,[4] which is a reasonable result, given the risks in the case and the inherent risks and delays associated with litigation. Additionally, with only 108 class members, the amount being received by each class member is substantial. The average per class member is almost $1,000 ($958.33), with approximately one third of the class receiving over $1,000, and an additional one third receiving over $300. These recoveries are significant in a case such as this one, which concerned alleged underpayments of ten minutes per shift. Schwab Aff. ¶¶ 12-13.

_____

[4]    Plaintiffs' counsel calculated $117,217.86 in potential single damages for the class in making the final calculations in this case. However, that number is likely inflated because of favorable assumptions made regarding the number of unpaid overtime hours. Using straight time calculations, the total single damages comes to $85,323.76, which is approximately 80% of the amount to be distributed to the settlement class members here. Schwab Aff. ¶ 10.

Finally, the allocation formula is fair in that it reimburses class members based on the type and extent of their injuries, which courts have found to be presumptively reasonable. *See, e.g., Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 328 (3d Cir. 2011) ("Courts generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable") (citations omitted); *Walsh v. Popular, Inc.*, 839 F. Supp. 2d 476, 482 (D.P.R. 2012) (approving methodology for calculating shares from class settlement based on "each class member's losses relative to those of the class as a whole"); *Hochstadt v. Bos. Sci. Corp.*, 708 F. Supp. 2d 95, 110 (D. Mass. 2010) (holding that plan of allocation was reasonable because it was based on class members' losses).

## III.    The proposed incentive payments to the named plaintiffs are fair and reasonable.

The proposed incentive payments are intended to compensate Baraa Fadel, Hakima Aitelhadj, KaRon Coleman, Matthew Greene, and Joseph McGunigle for the effort and risk associated with their role in serving as named plaintiffs in this case and for their broader general releases of claims against Defendants, as well as to compensate Plaintiff Fadel for his additional alleged damages related to his compelled participation in the weekly telephone conferences and other off-the-clock work described in the Complaint.

Courts have widely recognized that incentive payments serve an important function in promoting enforcement of state and federal law by private individuals, while encouraging class action settlements. *See Murray Grocery Delivery E-Servs. USA*

15

*Inc.,* 55 F.4th 340, 353 (1st Cir. 2022) ("incentive payments remove an impediment to bringing meritorious class actions" since named plaintiffs must "bear the brunt of litigation").[5]  As one federal district court has noted, incentive payments "are common in class action cases and serve to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiffs. . . It is important to compensate plaintiffs for the time they spend and the risks they take." *Beckman*, 293 F.R.D. at 483 (citations omitted).

It is not uncommon for courts to approve incentive payments substantially greater than those requested in this case.  *See, e.g., Bekker v. Neuberger Berman Grp. 401(k) Plan Inv. Comm.*, 504 F. Supp. 3d 265, 271 (S.D.N.Y. 2020) (awarding $20,000 incentive payment to ERISA plaintiff who willingly put himself forward in litigation against former employer, risking "alienation from employers or peers"); *Gordon v. Mass. Mutual Life Ins. Co.,*  No. 13-CV-30184-MP, 2016 WL 11272044, at *1  (D. Mass. Nov. 3, 2016) (awarding incentive payments of $20,000 each to named plaintiffs).[6]  In wage and hour

---

[5]      *See also Carlson v. Target Enter., Inc.*, 447 F. Supp. 3d 1, 5 (D. Mass. 2020) ("Courts 'routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.'") (quoting *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 468 (D.P.R. Sept. 13, 2011)); *see also* Prelim. Approval Mot. at 17.

[6]      *See also In re Relafen Antitrust Litig.*, 231 F.R.D. at 82 (approving incentive payments ranging from $8,000 to $14,000); *Carlson*, 447 F. Supp. 3d at 5 (approving incentive payment of $7,500); *Scovil v. FedEx Ground Package Sys., Inc.*, No. 1:10-CV-515-DBH, 2014 WL 1057079, *5-8 (D. Me. Mar. 14, 2014) (approving incentive payments from $10,000 to $20,000 in wage and hour case); *see also* Prelim. Approval Mot. at 18.

cases, "awards of $10,000 and $15,000 are not uncommon and on occasion reach $20,000, $30,000 and higher." *Scovil*, 2014 WL 1057079 at *6 (summarizing cases). As in these cited cases, the proposed incentive payments here are reasonable where Named Plaintiffs have invested significant personal time in the litigation on behalf of the class, assisting in investigation, negotiation strategy, and in the mediation itself.

Incentive payments serve a particularly important role in employment class actions. Lead plaintiffs may risk their livelihood and future employment prospects to bring a case forward on behalf of their fellow co-workers, especially in a relatively narrow field such as the security guard industry. Precisely because so many employees are afraid of the very real risk of retaliation or other ill effects, courts have recognized the important role of incentive payments in the employment context. "The reason commonly given for the higher awards in [employment] cases is the fear and risk of retaliation and embarrassment in the workplace, on top of the time and administrative commitment that is commonly shared in all cases, employment or not." *Scovil*, 2014 WL 1057079, at *6. "[Enhancement] awards are particularly appropriate in the employment context. In employment litigation, the plaintiff is often a former or current employee of the defendant, and thus, by lending his name to the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers." *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 187 (W.D.N.Y. 2005).

Plaintiff Fadel's proposed incentive payment of $12,500 is reasonable, reflecting both his releasing additional claims against Defendants and his substantial assistance in the case and the mediation. Above and beyond the requirements allegedly placed on

other class members, Defendants additionally allegedly obligated Plaintiff Fadel to

participate in the weekly telephone conferences and other, off-the-clock work of

updating upper management described in the Complaint.  In addition, Plaintiff Fadel

assisted in preparing for the mediation and attended the entire session, detailing for the

mediator his own experiences and his understanding of Defendants' practices.  His

participation in this litigation was critical in enabling the parties to reach an agreement,

rendering his incentive payment reasonable.  *See generally Feinberg v. T. Rowe Price Grp.,

Inc.*, 610 F. Supp. 3d 758, 774 (D. Md. 2022) (approving incentive payments to ERISA

plaintiffs ranging from $10,000 to $15,000, varying based on participation in litigation).

He also served as a liaison between Class Counsel and the other Named Plaintiffs,

putting in extensive time communicating with and updating the other Named Plaintiffs

and gathering information for Class Counsel.

For all of these reasons, Plaintiffs submit that the proposed incentive payments

are fair and reasonable.

## IV.    The proposed attorneys' fee award is fair and reasonable.

Lastly, the proposed settlement provides for a standard one-third share of the

gross settlement fund ($66,000) to be paid as attorneys' fees to Plaintiffs' counsel.  That

allocation is fair and reasonable and should be approved by the Court.  Named

Plaintiffs signed retainer agreements providing for a one-third contingency payment.

Moreover, the class notice clearly explains to the class that one-third of the settlement

proceeds will be used to pay for attorneys' fees.  No class members objected to this

payment for attorneys' fees.

Courts generally favor an award of fees from a common fund, as called for by the proposed settlement in this case. As the Supreme Court has explained:

> [T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. . . . Jurisdiction over the fund involved in the litigation allows a Court to prevent . . . inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (citations omitted).[7] When awarding fees from a common fund, the "percentage of the fund" method is preferred over the lodestar method. The First Circuit has recognized that the percentage method is less burdensome to administer than the lodestar method. *In re Thirteen Appeals*, 56 F.3d 295, 307 (1st Cir. 1995); *see also Carlson*, 447 F. Supp. 3d at 3 ("In the First Circuit, the percentage of fund methodology . . . is favored and appropriate in common fund cases."). The First Circuit also endorsed the percentage method because it is result-oriented, and therefore promotes a more efficient use of attorney time—a lodestar method may give attorneys an incentive to spend as many hours as possible on the litigation and may discourage early settlements. *See In re Ranbaxy Generic Drug Application Antitrust Litig.*, No. 19-MD-02878-NMG, 2022 WL 4329646, at *3 (D. Mass. Sept. 19, 2022) ("The First Circuit has acknowledged the "distinct advantages" of the

---

7       *Accord US Airways, Inc. v. McCutchen*, 569 U.S. 88, 96 & n.4 (2013) (collecting cases and noting that the doctrine is based in equity and avoids unjustly enriching those who benefit from a suit)

POF method, explaining that it is less burdensome, enhances efficiency and better approximates the marketplace dynamics."). When using the percentage method, courts routinely approve fee awards that represent one-third of the settlement fund.[8]  *See, e.g., Torres et al. v. Niche, Inc.*, C.A. No. 12-cv-12059-RGS (D. Mass. Mar. 19, 2015) (approving one-third attorneys' fees in Worker Adjustment and Retraining Notification Act case).

An award of one-third of the fund is fair and reasonable for three primary reasons. First, awarding one-third from the common fund recognizes the vital role that contingency arrangements play in making legal counsel available to individuals who cannot afford hourly fees. Unlike traditional firms that receive hourly fees on a monthly basis, employment counsel who take cases on contingency often spend years litigating cases (typically while incurring significant out-of-pocket expenses for experts, travel, etc.), without receiving any ongoing payment for their work. Sometimes fees and expenses are recovered; other times, despite hundreds of hours of work, nothing is recovered. This type of practice is viable only if attorneys, having received nothing for their work on some cases, receive more in other cases than they would if they charged hourly fees. Courts have long recognized this reality. *See, e.g., In re Union Carbide Corp. Consumer Prods. Bus. Secs. Litig.*, 724 F. Supp. 160, 168 (S.D.N.Y. 1989) ("Contingent fee

---

[8]      A sample of cases in which a one-third fee was approved include: *Gordan*, 2016 WL 11272044, at *2 (D. Mass. Nov. 3, 2016); ("[T]he one-third fee requested here is fair and reasonable"); *In re Relafen Antitrust Litig.*, 231 F.R.D. at 85–89 (D. Mass. 2005); *Bennett v. Roark Capital Grp., Inc.*, 2011 WL 1703447, at *2 (D. Me. May 4, 2011) (describing one-third fee as "customary"); *Chalverus v. Pegasystems, Inc.*, C.A. No. 97-12570-WGY (D. Mass. December 19, 2000); *see also* Prelim. Approval Mot. at 22.

arrangements implicitly recognize the risk factor in litigation and that the winning cases must help pay for the losing ones if a lawyer who represents impecunious plaintiffs, or those plaintiffs not so fully committed as to put their own money where their mouth is, will remain solvent and available to serve the public interest.").

The inability of plaintiffs to afford hourly fees is especially common in the employment context, where many workers are low wage earners and cannot pay several hundred dollars per hour for legal representation.  Contingency fee arrangements make it possible for firms such as Fair Work, P.C. and the Law Office of Alan David Meyerson to "serve the public interest" by taking on class actions that deter wage law violations by employers.  *Skirchak v. Dynamics Research Corp.*, 432 F. Supp. 2d 175, 178–79 (D. Mass. 2006).  "Allowing private attorneys to prosecute such actions in the aggregate effectively ensures enforcement of the wage laws by motivating employers to comply or face potentially large-scale litigation, and by providing counsel with an incentive to pursue such claims."  *Id.* at 179.

Second, a one-third award incentivizes parties to discuss settlement early and reach an early resolution of a case, if possible.  Indeed, it "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation."  *Eastman Kodak*, 228 F.R.D. at 188 (granting 40% fee request).

Third, a one-third award recognizes that firms may spend years developing the case law in a particular field and obtaining favorable decisions, all of which contributes to efficient and effective litigation on behalf of plaintiffs.  *See In re Giant Interactive Grp.*,

21

*Inc. Sec. Litig.*, 279 F.R.D. 151, 165 (S.D.N.Y. 2011) ("[T]he Court finds that public policy supports the award of a 33% fee in this case, the better to 'attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so.'") (quoting *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d. 319, 359 (S.D.N.Y. 2005)).  Here, for example, Plaintiffs' counsel collectively have extensive experience litigating class action wage cases and have contributed to the development of the law in this area.  That experience also significantly increased the risks of trial and appeal for Defendant.

Plaintiffs' counsel have spent approximately 257 hours combined, representing approximately  $131,000 in attorneys' fees and expended several thousand dollars in costs in litigating this case.  Vazquez Aff. ¶ 4.  They have invested numerous hours in the settlement approval process.  Therefore, the proposed attorneys' fees by no means represent a windfall for Plaintiffs' counsel.  Finally, the amount sought for expenses, relating exclusively to the costs of settlement administration, is more than reasonable. *See In re Fid./Micron Sec. Litig.*, 167 F.3d 735, 737 (1st Cir. 1999) (counsel "may recover expenses, reasonable in amount, that were necessary to bring the action to a climax.").

Based on these considerations, Plaintiffs propose that a one-third award from the settlement fund for fees is fair and reasonable, and ask that it be approved by the Court.

## CONCLUSION

For the reasons set forth here, Plaintiffs respectfully ask that the Court enter the proposed final approval order attached here as Exhibit A.

Respectfully submitted,

BARAA FADEL, HAKIMA AITELHADJ,
KARON COLEMAN, MATTHEW GREENE,
and JOSEPH MCGUNIGLE on behalf of
themselves and others similarly situated,

By their attorneys,


 _/s/ Osvaldo Vazquez_
Hillary Schwab, BBO #666029
Osvaldo Vazquez, BBO #711808
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3260
www.fairworklaw.com
Email: hillary@fairworklaw.com
        oz@fairworklaw.com

Alan D. Meyerson, BBO #682515
Law Office of Alan David Meyerson
100 State Street, Suite 900
Boston, MA
(617) 444-9525
Email:  alan@alandavidmeyerson.com


Dated: September 20, 2023

<u>**CERTIFICATE OF SERVICE**</u>

      I certify that, on September 20, 2023, I served a copy of the foregoing document, through the ECF system, on counsel for the Defendants.

                                */s/ Osvaldo Vazquez*

                                  Osvaldo Vazquez, Esq.